# UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NATHAN M. F. CHARLES, Esq.,

    Plaintiff,

v.

PAUL J. MIOVAS, Esq.,

    Defendant.

Civil Action No. _____

JURY TRIAL DEMANDED

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Nathan M. F. Charles, Esq., submits the following COMPLAINT AND DEMAND FOR JURY TRIAL in accordance with F.R.C.P. 7(a)(1), 8(a), 10, 11, and 15(a)(1)(B). Plaintiff states:

### Jurisdiction and Venue

1. The Federal District Courts properly have jurisdiction over this action because it arises under federal statutory law, specifically 42 U.S.C. § 1983.

2. The U.S. District Court for the Middle District of Pennsylvania is a suitable venue because Defendant currently resides in Harrisburg, Pennsylvania.

### The Parties

3. At the time of the actions described herein, the Defendant, PAUL J. MIOVAS, was the Director of the Criminal Division of the Alaska Department of Law and had supervisory authority over all the District Attorneys' offices in the State of Alaska.

4. At the time of the actions described herein, Plaintiff, NATHAN M. F. CHARLES, was an Assistant District Attorney for the Alaska Department of Law working out of the District Attorney's Office for Kenai, Alaska.

**Relevant Background**

5. At the time of the cause of action, Plaintiff was 41-years-old. He grew up in Lebanon County, Pennsylvania after his natural father was killed in a plane crash in the U.S. Air Force. He attended the U.S. Naval Academy on a Presidential nomination for the children of servicemen killed in the line of duty. He became an officer in the U.S. Navy SEALs and served multiple combat tours in Afghanistan as well as additional operational deployments to Colombia and the Middle East. After leaving active duty, he became a strategist for the U.S. Department of Defense and used the Post 9/11 G.I. Bill to attend law school at night. He clerked for the Pennsylvania Supreme Court before being mobilized back to active duty at Naval Special Warfare Development Group, more commonly known as "SEAL Team SIX." While he was assigned to Development Group, he missed the birth of his first son, as well as most of the first six months of the child's life.

6. Plaintiff then joined the Counterespionage Section of the U.S. Department of Justice under the U.S. Attorney General's Honors Program. After several years of prosecuting spies, mercenaries, and arms dealers, he was called back to active duty again to manage a portfolio of special operations in Mexico and the Bahamas. During that assignment, his wife gave birth to a daughter. The Plaintiff also missed much of the first six months of his daughter's life due to his military service.

7. In, 2019, shortly after Plaintiff's fourth demobilization from active military service, the Anchorage Daily News and ProPublica published an investigative piece highlighting the epidemic of violent crime against women in tribal Alaska. The investigation prompted then-U.S. Attorney General William Barr to fund a grant for the State of Alaska to hire two prosecutors to focus on cases in the tribal regions. The U.S. Department of Justice advertised the

positions on its website, where it caught the Plaintiff's eye. Plaintiff discussed the positions with his wife, also a dedicated public servant and a Supervisory Intelligence Analyst within the Counterintelligence Directorate of the Federal Bureau of Investigation.

8. Plaintiff and his wife considered the positions even though it would be impossible for Plaintiff's wife to join him in Alaska due to her considerable responsibilities to the United States demanding her presence in and around Washington, D.C. However, they determined that, for a variety of reasons including the exigency of the sexual violence epidemic in one of America's most marginalized communities, Plaintiff should apply for the position.

9. The Criminal Division of the Alaska Department of Law (hereinafter "the Division") ultimately did not selected the Plaintiff for the grant positions because he had no previous experience with Alaska law. However, the officials that interviewed Plaintiff made special note of his leadership experience, pointed out that one of the factors that had prevented the Alaska Department of Law from adequately addressing the problems in the rural tribal areas was that it was generally understaffed, and asked him to interview for one of several unfilled Assistant District Attorney position throughout Alaska.

10. Shortly thereafter, the Division Offered the Plaintiff an Assistant District Attorney position in the rural Kenai Peninsula where it could put him to much-needed work, but with a few colleagues nearby to consult. Plaintiff accepted.

### The Defendant's Animus and Actual Malice

11. Plaintiff entered on duty with the Division in June 2020. He became a legal resident of the State of Alaska and remained so throughout the events in question. He purchased a pickup truck. He obtained a Real ID Act-compliant Alaska driver's license at considerable difficulty. He registered to vote in the State of Alaska and voted in both the primary and general

2020 elections in the State of Alaska. He purchased and renovated a small home in Kenai, Alaska. Plaintiff intended to remain in Alaska for as long as his duties as a husband and a father would permit it.

12. However, Plaintiff noticed numerous problems with the Division's operations almost as soon as he joined it. The Division was timid in its prosecutions. It offered low plea offers for the sake of clearing cases. The Division endured frequently unscrupulous and unethical behavior from the defense bar and refused to request sanctions from the courts. Although it was true that the Division was short many Assistant District Attorneys, its "resource shortages" were mostly attributable to mismanagement of resources at the Division's disposal. Further, cases of even the slightest import were micromanaged from the Division headquarters in Anchorage, further draining valuable resources.

13. Particularly alarming was the fact that the Division had invested significant public funds into a cloud-based docket management system but barely used it. The most significant factor in the Division's failure to properly use the technology was that some senior employees within the Division were unwilling to modify their existing modes of operation and invest time into learning to use new tools. Instead, the lazy but influential minority insisted that the majority continue to keep records in voluminous paper files. The failure to fully adopt the new technology was made even more egregious by the fact that Alaska's population was spread out over a land area equivalent to more than 1/5 of the land mass of the continental United States, making it almost impossible to share important paper records between far-flung offices. The failure was made downright stupefying given that the Division was in the middle of the worst disease pandemic in American history, making some degree of remote telework a necessity for employees with certain health conditions.

4

14. The numerous management failures manifested in two ways: (1) The Division cleared many fewer cases than it had the capacity to clear; and (2) instead of adopting readily available technical solutions to clear more cases, the Division instead mitigated its ballooning caseloads by offering plea deals with sentences far below what was commensurate with the corresponding offenses. Plaintiff quickly realized that the largest factor contributing to the problems highlighted by the Anchorage Daily News and ProPublica was garden-variety mismanagement and inefficiency.

15. Plaintiff was not the only member of the Division to Notice. Another Assistant District Attorney was hired into the Kenai District Attorney's Office around the same time as the Plaintiff. She entered duty with the Division shortly after retiring from the Judge Advocate General's Corps within the United States Marine Corps at the rank of Lieutenant Colonel. She quit mere weeks into her tenure.

16. Plaintiff did his best to gently cajole the Division into more efficient operations. When that failed, he pressed more forcefully. Slowly, the management of the Division started to realize that Plaintiff and others had begun to attribute the Division's problems to the management itself. At that point, the management enhanced its scrutiny of Plaintiff and retaliated against him in various petty ways. Thus, the events described further in this Complaint were not an isolated incident in which Defendant made an uncharacteristically bad call, but rather the point at which Defendant's long train of abuses matured into an obvious deprivation of a constitutional right without a compelling government interest.

17. In or around early November 2020, Plaintiff made a report to the Human Resources Department of the Criminal Division of the Alaska Department of Law stating that he was being treated unfairly by his supervisors at work. Plaintiff requested the Human Resources

Department arrange a mediation to quell the controversy. The HR officer that Plaintiff spoke to on the issue outwardly encouraged the mediation but did not arrange for it.

### **The Specific Conditions under which the Defendant Deprived the Plaintiff of Fundamental Rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution**

18. The Alaska Department of Law had assigned the Plaintiff to a misdemeanor docket. Prior to the Plaintiff's entry on duty in June 2020, the Alaska Courts had indefinitely delayed all misdemeanor trials due to the pandemic and were conducting all other hearings telephonically. At the time of the events described below, the Alaska Courts had not set a firm date beyond which they intended to resume misdemeanor trials or in-person pretrial hearings. As a result, all Plaintiff's interactions with the Alaska Courts were remote, and all of his other duties were of a nature that he could easily perform them from any location in the world with internet access. Nevertheless, there was compelling government interest in Plaintiff remaining in Kenai if for no better reason than greater access to his colleagues and more opportunities to positively influence the operation of the Division.

19. In or around early November 2020, Plaintiff made plans to host his wife and children in Alaska for Thanksgiving.

20. However, on or about November 12, 2020, the U.S. Centers for Disease Control and Prevention announced that the COVID-19 pandemic was accelerating. It advised families to minimize travel over Thanksgiving due to the COVID-19 pandemic. It also advised employers to maximize social distancing and use telework wherever possible.

21. Based on the CDC's guidance, Plaintiff's wife changed decided she would not travel to Alaska with Plaintiff's children. Instead, Plaintiff made arrangements to travel to Maryland for the holiday. In that way, Plaintiff's family could be together over the holiday, but

6

only one member of the family, vice three, would have to travel, thereby minimizing potential exposure and transmission of the pandemic.

22. Also on or about November 12, 2020, Alaska Governor Dunleavy issued a YouTube video announcing that Alaska's COVID-19 numbers were "in the red," meaning that, "COVID-19 is rapidly spreading through our communities." Consequently, he ordered all State of Alaska employees to work from home wherever possible. He stated, in effect, that Alaska had to drastically increase its efforts to combat COVID-19 for the next three weeks. The video is available here: https://www.youtube.com/watch?v=uwQUnIAjthk. As a result, the Plaintiff's continued physical presence in Alaska was of no benefit to either the Plaintiff or the State of Alaska.

## COUNT 1
### (Civil Rights Violation, 42 U.S.C. § 1983)

23. Paragraphs 1-23 are hereby incorporated into this Count.

24. On or about November 13, 2020, the Plaintiff informed his direct supervisor of the change in his vacation plans. He also stated that, since there was no benefit in his returning to the State of Alaska to merely conduct his duties from his empty house in Alaska, he would stay in Maryland after the holiday and conduct his duties from his family home in Maryland so that he could better attend to his duties as a husband and a father. He further stated that he would return to the State of Alaska on any of the following conditions: (1) expiration of Governor Dunleavy's general order to work remotely (presumably three weeks); (2) the Kenai Courts resuming trials or in-person hearings; or (3) the expiration of his previously approved Christmas leave if either of the previous conditions occurred during that period. In other conversations, he also stated that he would return to Alaska as soon as any other material need for his physical presence arose.

7

25.     On November 14, 2020, Defendant emailed Plaintiff and Plaintiff's direct supervisor.  Defendant stated that Plaintiff was not to leave the State of Alaska with the equipment necessary for the execution of his duties, specifically the state-issued laptop that was necessary to remotely access the Department's email and online file systems.  Defendant offered the following obviously pretextual rationales for the decision: (1) "the lack of exigency for such an accommodation," despite the fact that the United States was then immersed in the most deadly disease pandemic in its history and the Division had already ordered almost all of its employees to work remotely; (2) "the lack of any definitive period of time for the arrangement," despite the fact that the Plaintiff had articulate several reasonably definitive conditions under which he planned to return to Alaska immediately, and the Governor himself had stated that the anticipated timeline for the emergency efforts was three weeks; and (3), most tellingly, "the unprofessional and abrupt manner in which [the Plaintiff] approached the situation," despite the fact that the Plaintiff had matter-of-factly presented his plans in writing to his supervisor and cited the relevant employee regulations.  Defendant concluded that if Plaintiff removed his state-issued laptop from the State of Alaska, Plaintiff would face "adverse employment action, up to possible termination."

26.     In fact, Defendant's order that Plaintiff not remove his laptop from the state was purposefully designed to make it impossible for Plaintiff to fulfill his duties remotely.  It was further Defendant's intent that Plaintiff remains in Alaska, suffer continued and unnecessary separation from his family, and thereby punish Plaintiff for what Defendant perceived to be Plaintiff's insubordination in questioning authority.  In the alternative, it was Defendants' intent that the order for Plaintiff to needlessly remain in Alaska cause Plaintiff to quit his job in Alaska

8

or -- by disregarding the order -- provide what Defendant perceived to be sufficient justification to fire Plaintiff.

27. Defendant's orders were not motivated by a compelling state interest in Plaintiff remaining in Alaska. Far from it -- no one had an interest in Plaintiff remaining in Alaska by virtue of the Governor's general order to work remotely. Moreover, Defendant attempted to reverse the burden of proof, stating in effect that Plaintiff had not provided an adequate justification for traveling to be with his family, when in fact Defendant, as a state actor, bore the burden of articulating a compelling state interest in depriving Plaintiff access to his wife and children.

28. In fact, Defendant's orders were motivated by Plaintiff's previous observations about Defendant's questionable leadership and management as well as Plaintiff's complaints to the Division's Human Resources Department. In giving his order for Plaintiff to not remove the equipment necessary for Plaintiff to do his job from the State of Alaska, Defendant intended to deprive Plaintiff of his right to interstate travel, deprive Plaintiff of his right to access his wife and children, and deprive him of his right to cohabitate with his family. In the more general sense, Defendant's intent was to show Plaintiff who was boss.

29. Plaintiff responded to Defendant's November 14, 2020, email by stating that Plaintiff was going to work from his home in Maryland so that he could attend to his duties as a husband and a father regardless of whether he had permission from the Alaska Department of Law. The email included a memorandum of law explaining in detail the ways in which Defendant's orders were retaliatory and unconstitutional deprivations of Plaintiff's fundamental rights. Defendant gave no heed to Plaintiff's warnings. Plaintiff's direct supervisor responded that if Plaintiff left the State of Alaska with his State-issued laptop, he would be fired.

30. On or about November 18, 2020, Plaintiff left the State of Alaska with his State-issued laptop and returned to his family home in Maryland. He informed his direct supervisor and Defendant that he had arrived in Maryland shortly after his arrival.

31. Plaintiff telephonically appeared for a set of hearings with the Kenai Courts on November 20, 2020, from his wife and children's house in Maryland. As he had predicted, he was successful in the execution of his assigned duties from Maryland.

32. On the evening of November 20, 2020, Defendant fired Plaintiff without stating a cause.

33. Interstate travel is a fundamental right protected by the Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution.

34. The right of a family to live together is also a fundamental right protected by the Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution.

35. Defendant's restrictions on Plaintiff's right to interstate travel and to take advantage of an opportunity to cohabitate with his family while still satisfying the State of Alaska's compelling state interest in his services constituted denials of his fundamental rights without a corresponding, compelling state interest in his physical presence.

36. Moreover, Defendant: (1) brazenly and explicitly tied the restrictions on Plaintiff's civil rights to professional disagreements, and (2) blatantly disregarding Plaintiff's warnings that his conduct was both unconstitutional and actionable constituted reckless and callous indifference to Plaintiff's civil rights.

37. Plaintiff's termination caused him to lose approximately $30,000 in wages.

WHEREFORE, Plaintiff seeks a judgment ordering the following:

A. That Defendant, PAUL J. MIOVAS, recklessly and with callous indifference denied Plaintiff, NATHAN M. F. CHARLES, his civil rights;

B. That Defendant, PAUL J. MIOVAS, pay the damages described herein in amounts deemed appropriate by the Court;

C. That the Defendant, PAUL J. MIOVAS, pay punitive damages in the amount of $10,000,000; and

D. Any additional relief deemed appropriate by the Court.

Dated: September 30, 2022          Respectfully submitted,

NATHAN M. F. CHARLES, Esq.
PA Attorney Number 314597
*Pro se*
11313 Gainsborough Road
Potomac, MD 20854
717-202-9407
nate@charleslegalandsecurity.com